UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-21033-CV-LENARD/GOODMAN

SECURITIES AND EXCHANGE COMMISSION,

  Plaintiff,

 v.

LOTTONET OPERATING CORP.,
DAVID GRAY,
JOSEPH VITALE A/K/A DONOVAN KELLY,

  Defendants, and

ORACLE MARKETING GROUP INC.,
CRM INTERACTIVE LLC,
THE COUNCIL CLUB LLC,

  Relief Defendants.

_____/

**STATUS REPORT OF RECEIVER RYAN K. STUMPHAUZER, ESQ.**

 I, Ryan K. Stumphauzer, Esq., not individually, but solely in my capacity as the Court-appointed receiver (the "Receiver") for LottoNet Operating Corp. ("LottoNet"), Oracle Marketing Group Inc., CRM Interactive LLC, the Council Club LLC, and their affiliates, subsidiaries, successors and assigns (collectively, the "Receivership Entities" or "Estate"), and pursuant to the Court's order requiring a status report of the final fee application and final accounting [ECF No. 88], submit this status report regarding the present status of the Estate, the final fee application, and final accounting ("Status Report").

**IMPORTANT – PLEASE READ CAREFULLY**

 THE STATEMENTS CONTAINED IN THIS REPORT ARE BASED ON THE INVESTIGATION CONDUCTED FOLLOWING MY APPOINTMENT AS RECEIVER, AND FOCUS PRIMARILY ON EVENTS THAT OCCURRED SUBSEQUENT TO THE FILING OF

1

MY FIRST INTERIM JOINT APPLICATION FOR PAYMENT OF COMPENSATION AND REIMBURSEMENT OF EXPENSES FOR THE PERIOD MARCH 21, 2017 THROUGH APRIL 30, 2017, AND MY SECOND REPORT OF RECEIVER. I HAVE COMPILED THIS STATUS REPORT BASED ON BOTH MY PROFESSIONALS' AND/OR MY: (1) REVIEW OF THOUSANDS OF PAGES OF DOCUMENTS, INCLUDING EXTENSIVE FINANCIAL RECORDS AND EMAIL COMMUNICATIONS; AND (2) INTERVIEWS WITH NUMEROUS INDIVIDUALS, INCLUDING FORMER EMPLOYEES, ACCOUNTANTS, LEGAL PROFESSIONALS, VENDORS, INVESTORS, FINANCIAL INSTITUTIONS, AND OTHER RELATED PERSONS. THE FACTS AND CONCLUSIONS HEREIN MAY BE SUBJECT TO CHANGE AS THE RECEIVERSHIP WINDS DOWN. OTHER THAN THE AMOUNTS CONTAINED IN BANK ACCOUNTS, THE VALUE OF MOST OTHER ASSETS, INCLUDING PURPORTED ASSETS BELONGING TO LOTTONET PERU, S.A.C., HAS NOT YET BEEN DETERMINED DEFINITIVELY.

AS ADDITIONAL INFORMATION IS DISCOVERED, SUCH AS INFORMATION PERTAINING TO THE STATUS OF THE LOTTONET PERU, S.A.C. ACCOUNT AND REPATRIATION OF THE FUNDS IN THAT ACCOUNT, IF ANY, I INTEND TO FILE ADDITIONAL REPORTS AS NEEDED, EVALUATE WHETHER THERE ARE SUFFICIENT FUNDS IN THE ESTATE TO WARRANT A DISTRIBUTION AND INITIATE THE CLAIMS PROCESS, AND FILE A FINAL FEE APPLICATION AND FINAL ACCOUNTING TO CLOSE THE RECEIVERSHIP.

I CAUTION INDIVIDUALS OR ENTITIES FROM INTENTIONALLY MISREPRESENTING THE INFORMATION CONTAINED HEREIN, DISPARAGING THE RECEIVERSHIP ENTITIES WITH THE INFORMATION, OR USING IT FOR ANY OTHER

IMPROPER PURPOSE. ANY SUCH ACTION MAY HAVE SIGNIFICANT LEGAL CONSEQUENCES.

FINALLY, TO THE EXTENT THAT THE RECEIVERSHIP ENTITIES ARE EXPLORING POTENTIAL LAWSUITS AGAINST INDIVIDUALS OR ENTITIES, I HAVE NOT SET FORTH ALL OF THE INFORMATION SURROUNDING THESE POTENTIAL LAWSUITS SO AS NOT TO DISCLOSE PRIVILEGED, WORK PRODUCT INFORMATION, OR LITIGATION STRATEGY.

## I.     EXECUTIVE SUMMARY

My work as the Receiver, as well as the work of others who have worked with me, including Adam Schwartz, Esq., Jeffrey Sloman, Esq., Jorge Pérez Santiago, Esq., and members of my staff have been described in various reports and other filings made during the course of this case including the First Report of Receiver filed on June 1, 2017 [ECF No. 61]; Receiver's First Interim Joint Application for Allowance and Payment of Compensation and Reimbursement of Expenses for Receiver and his Counsel ("the "Interim Application") filed on June 17, 2017 [ECF No. 67]; and Second Report of Receiver filed on November 3, 2017 [ECF No. 75]. Per the Court's order, this Status Report provides a summary of the finances and activities of the Receivership and the status of the final accounting and report.

Since my appointment as Receiver, and continuing through the filing of this Status Report, I have maintained an open and continuous line of communication with LottoNet's investors via email, U.S. Mail, and telephone to provide updates and address any questions and concerns. I have also performed countless other tasks requiring an enormous time commitment and dedication of substantial resources, described in further detail below, including an investigation into the potential value of licenses and other assets that are allegedly held by LottoNet Peru, S.A.C. ("LottoNet

3

Peru"), and fielding and reviewing offers from third parties to purchase LottoNet assets and related letters of intent.

My ability to perform these tasks has been hampered, however, because the Receivership Entities had extremely limited assets at the time of my appointment, and those assets have been further depleted because the Receivership Entities have incurred reasonable and necessary expenses. Based on the lack of funds, we have been unable to hire financial professionals, foreign legal professionals, or other experts and consultants to aid the Receivership. Moreover, I was reluctant for several months to attempt to repatriate funds held in the name of LottoNet Peru at Banco Internacional del Peru ("Interbank") because I have been told by multiple witnesses that this account serves as security for potentially valuable gaming, lottery, and gambling licenses in Peru. Despite persistent efforts over several months, I have received incomplete or inconclusive information regarding the nature, value, and transferability of these alleged licenses from LottoNet's former Peruvian lawyer, Ever Santillan, LottoNet's former CEO, David Gray, and other former LottoNet employees.

Given the insufficient information, and our financial inability to hire Peruvian lawyers or consultants, I have now decided that it is in the best interests of the receivership to attempt to repatriate any funds held in LottoNet Peru's name at Interbank. To that end, I have begun the process to repatriate the funds to the Estate. If successful, the addition of the LottoNet Peru funds to the Estate would be material to the accounting of the Estate. Consequently, I respectfully request an additional ninety (90) days to submit a final accounting and fee application.

## II. ACTIVITIES RELATED TO OFFICES AND ASSETS

### A. Estate financial information.

As indicated in the First Report of Receiver, [ECF No. 61], the vast majority of the accounts of the Receivership Entities are maintained at Bank of America ("BOA"). As of October 10, 2017, the following net cash amounts were located in the following Estate accounts:

| Account | Financial Institution | Net Cash Amount |
|---|---|---|
| LottoNet Operating Corp. | BOA | $32,925.40 |
| CRM Edge LLC | BOA | $68.74 |
| Global Refund Corporation | BOA | $3,551.30 |
| CRM Interactive Technologies LLC | BOA | $12,558.07 |
| LN Concierge LLC | BOA | $65.00 |
| **Total Cash Amount** | | **$49,168.51** |

Given that I have exclusive control of the accounts, and that I have not executed any recent transactions, the bank account balances have not changed materially since that time. Further, these account balances will be updated in subsequent filings with the Court.

On the liability side, I have continued the process of reviewing invoices to identify the Receivership Entities' creditors and the debts owed, albeit without the assistance of bookkeepers or accountants. In accordance with the Order, I have also paid certain necessary expenses in carrying out my duties and responsibilities as Receiver. Specifically, the tables[1] below reflect the Receivership Estate's known outstanding vendor invoices, as well as expenses that were paid based on my instruction after being appointed as Receiver. Notably, apart from work performed by my staff and the law firm of Homer Bonner Jacobs, P.A., described in section III.A. below,

---

[1] Due to the limited nature of the Estate's assets, the financial information available to me, and the disbursements made by the Estate, I believe that the Standard Fund Accounting Report would be of no benefit to the Court or investors, and have therefore decided to present the Estate's limited finances in a format better suited to detail the Estate's finances.

these tables reflect information that has not changed since the Second Report of Receiver filed on November 3, 2017:

*Identified Outstanding Vendor Invoices[2]*

| Vendor | Amount | Invoice Date |
|---|---:|---:|
| MegaPath | $0 | 7/19/2017 |
| Comcast Business | $1,252.42 | 5/1/2017 |
| Amscot | $1,130.00 | 3/23/2017 |
| FedEx | $8.71 | 4/3/2017 |
| FedEx | $50.20 | 3/24/2017 |
| FedEx | $9.75 | 3/27/2017 |
| T-Mobile | $3,315.34 | 5/3/2017 |
| IT Nguyễn Nhất Hoá | $1,920.00 | 3/27/2017 |
| IT Nguyễn Nhất Hoá | $1,920.00 | 3/20/2017 |
| IT Nguyễn Nhất Hoá | $1,920.00 | 3/13/2017 |
| IT Nguyễn Nhất Hoá | $5,760.00 | 10/31/2016 |
| AnswerConnect | $248.00 | 4/18/2017 |
| Affinity Resources, LLC | $1,014.80 | 11/15/2016 |
| Affinity Resources, LLC | $913.32 | 11/22/2016 |
| Affinity Resources, LLC | $1,014.80 | 11/29/2016 |
| Affinity Resources, LLC | $811.84 | 12/6/2016 |
| Affinity Resources, LLC | $1,014.80 | 12/13/2016 |
| Affinity Resources, LLC | $1,014.80 | 12/20/2016 |

---

[2] By including vendor invoice information in this table, I do not take any position regarding the validity of these invoices, or whether there are legal means to reduce or avoid these debts. Instead, this table is merely intended to convey the amounts that vendors claim they are owed.

| | | |
|---|---:|---|
| Affinity Resources, LLC | $926.01 | 12/27/2016 |
| Affinity Resources, LLC | $1,796.01 | 12/27/2016 |
| Affinity Resources, LLC | $870.00 | 1/03/2017 |
| Affinity Resources, LLC | $123.20 | 1/3/2017 |
| Affinity Resources, LLC | $870.00 | 1/10/2017 |
| Affinity Resources, LLC | $870.00 | 1/17/2017 |
| Affinity Resources, LLC | $2,094.00 | 1/31/2017 |
| Affinity Resources, LLC | $731.00 | 1/24/2017 |
| Affinity Resources, LLC | $2,094.00 | 2/07/2017 |
| Affinity Resources, LLC | $1,115.20 | 2/21/2017 |
| Affinity Resources, LLC | $1,746.00 | 2/28/2017 |
| Affinity Resources, LLC | $1,224.00 | 3/7/2017 |
| Savage Global Marketing | $3,000.00 | 2/15/2017 |
| My Simple Techs | $250.00 | 1/18/2017 |
| My Simple Techs | $250.00 | 1/4/2017 |
| Clean Space | $1,365.00 | 3/6/2017 |
| Clean Space | $1,365.00 | 4/5/2017 |

Total: $44,008.20

*Vendor Payments Made by Receiver*

| **Vendor** | **Amount** | **Invoice Date** |
|---|---:|---|
| Office Supplies | $250.26 | 3/22/2017 |
| Locksmith | $1,524.00 | 3/21/2017 |
| Amazon Web Services | $1,906.89 | 4/3/2017 |
| Computer IT programmer | $715.00 | 4/20/2017 |
| PaperStreet Receivership Website | $350.00 | 5/3/2017 |

7

| | | |
|---|---:|---|
| Google G Suite Account | $177.00 | 5/24/2017 |
| UPS Store Mailbox | $34.00 | 6/22/2017 |
| Forensic Computer Expert | $1,200.00 | 8/31/2017 |
| | | |
| Total: | $6,157.15 | |

***Vendor Payments Made by Receiver's Counsel***

| **Vendor** | **Amount** |
|---|---:|
| Filing Fee for the U.S. District Court for the District of Delaware | $47.00 |
| Filing Fee for the U.S. District Court for the District of Arizona | $47.00 |
| Filing Fee for U.S. District Court for the Southern District of New York | $47.00 |
| Filing Fee for the U.S. District Court for the Northern District of Florida | $47.00 |
| Filing Fee for the U.S. District Court for the Middle District of Florida | $47.00 |
| Express Mail (FedEx) | $145.63 |
| Photocopies | $495.25 |
| Postage | $17.58 |
| Long Distance Telephone Calls | $70.75 |
| Pacer/Westlaw Research | $100.18 |
| Parking Fees | $52.00 |
| **Subtotal:** | **$1,116.39** |

On June 16, 2017, I submitted the Interim Application [ECF No. 67], in which I requested authorization to pay fees and costs for myself and the Receiver's counsel. Taking into account a holdback of 20%, the Receiver's and his legal counsel's fees totaled $57,956.80 and their joint costs totaled $5,512.54 at that time; however, given the Receivership Estate's limited assets, the Receiver requested that the Court authorize payment of the $4,412.54 in costs and $6,000 in fees to the Receiver and $5,000 in fees to the Receiver's legal counsel. On February 26, 2018, the Court authorized interim compensation to the Receiver in the amount of $32,129.00 (comprised of

$40,161.25 in fees net a 20% holdback) for the period of March 21, 2017 through April 30, 2017; interim compensation to Homer Bonner Jacobs, P.A. in the amount of $21,801.74 (comprised of $27,252.18 in fees net a 20% holdback) for the period of March 21, 2017 through April 30, 2017; and interim reimbursement of expenses to the Receiver and Homer Bonner Jacobs, P.A. in the total amount of $5,512.54. [ECF No. 83]. Although the Court has authorized the payment of such fees and expenses, to date neither myself nor counsel for the Receiver, Homer Bonner Jacobs, P.A., have accepted any compensation due to the Estate's limited funds.

**B.     Substantial assistance to the government's investigation regarding preservation of electronically stored data.**

As I described in detail in my prior reports, since my appointment as Receiver and continuing through this Status Report, myself and my staff have devoted a significant amount of time and substantial Estate resources to the preservation and maintenance of electronically stored data, which included restoration of CRM Edge, a sophisticated customer relationship management software package that maintained detailed information for LottoNet investors, LottoNet sales agents, and investment transactions. The preservation and maintenance of this data assisted the FBI and the SEC in their ongoing investigations, prosecutions, and recovery of funds for investors.

**C.     Investigating LottoNet Peru's assets and assessing the repatriation of funds.**

As stated in the Second Report of Receiver, upon my appointment I learned that LottoNet's sales agents were actively soliciting investors to purchase shares of LottoNet Peru, and the paper records in LottoNet's office showed that LottoNet transferred $72,000 of investor money to an account in LottoNet Peru's name at Interbank on February 24, 2017. As part of its sales strategy, LottoNet provided to potential LottoNet Peru investors a "shareholder discovery" packet and subscription agreement that stated that the Government of Peru granted LottoNet, through LottoNet Peru, described as its subsidiary, "an exclusive ten-year lottery and gaming license, with

9

unlimited options to renew every five years thereafter." LottoNet further represented to investors that the license authorized it to operate its own lottery in Peru as well as sell U.S. lottery tickets to Peruvian nationals.

Based on this information, I investigated whether LottoNet Peru actually owned any licenses in Peru, the value of such licenses, if any, and whether these licenses and associated bank accounts could be liquidated, transferred, or utilized in a manner to benefit the Receivership Entities. Specifically, I held a teleconference on April 3, 2017, with LottoNet's prior Peruvian counsel, Ever Santillan. Mr. Santillan initially advised that LottoNet Peru did obtain a license from the Government of Peru to operate a lottery, and that LottoNet Peru was required to maintain a bank account in Peru with a certain minimum balance to demonstrate its financial wherewithal to pay out winnings. As a result, Mr. Santillan indicated that LottoNet Peru maintained an account at Interbank, which he stated held a balance of $90,000, which was $18,000 more than the identified transfer of funds from a LottoNet Bank of America account to the Interbank account. According to Mr. Santillan, the withdrawal of those deposited funds at Interbank would result in the forfeiture of LottoNet Peru's license. Based on those representations and in the interest of maximizing value for LottoNet investors, I did not seek repatriation of LottoNet Peru's Interbank funds until I could verify the existence of the license, its alienability, and the purported license's value.

Given the lack of resources, however, I was unable to hire any attorneys, experts, or consultants in Peru to assist with this specialized investigation. Nonetheless, members of my staff made extensive efforts to reestablish contact with Mr. Santillan and to gather additional details about the license. These efforts were described in the Second Report of Receiver at 11.

As stated in the Second Report of Receiver, my staff held a subsequent telephone conference with Mr. Santillan in September 2017. Mr. Santillan provided information that seemed

to conflict with his prior representations to my staff and with LottoNet Peru's "shareholder discovery" packet. He indicated that LottoNet Peru is a Peruvian entity independent of LottoNet, and that he holds 40% of LottoNet Peru's shares while David Gray, in his individual capacity, holds the remaining 60% of the shares.[3] Furthermore, Mr. Santillan stated that LottoNet Peru did not obtain a license from the Government of Peru to operate a lottery. Rather, Mr. Santillan stated that LottoNet Peru paid initial startup costs of less than $1,000 and a bond of no more than $15,000 to receive a "fianza" or guarantee to participate in the Peruvian government's solicitation process.

Not having been able to ascertain the legitimacy and value of this purported license, and given the conflicting representations regarding ownership of LottoNet Peru, I have begun the process to repatriate the funds deposited into the Interbank account by LottoNet. To that end, I have made efforts to communicate with Interbank via telephone and international mail directing Interbank to freeze any and all of the funds, assets, accounts or properties of LottoNet Peru, provide me with a summary of all accounts or properties of LottoNet Peru which are maintained by or at Interbank, and make all accounts and properties of LottoNet Peru accessible to me.

In addition, I have sought the assistance of the Securities and Exchange Commission ("SEC") with identifying the appropriate steps to liquidate and repatriate the LottoNet Peru funds held at Interbank. The SEC is in the process of coordinating such assistance.

### D. Assess and review third-party interest in purchasing LottoNet and/or its intellectual property.

Subsequent to the Second Report of Receiver, I have had discussions with companies interested in purchasing LottoNet and/or LottoNet assets, including LottoNet's software platform, its purported gaming licenses, and other intellectual property. Although the Receivership

---

[3] In his Deposition, Mr. Gray testified that LottoNet Peru was a wholly owned subsidiary of LottoNet. Gray Tr. at 88 & 95.

11

ultimately received rudimentary term sheets from an interested purchaser, the proposal to purchase LottoNet and/or its assets was based upon misinformation (i.e., a mistaken belief that Mr. Gray would not be going to prison and would assist in running the company). Moreover, the companies that expressed interest in purchasing LottoNet and/or its assets were unable to prove their financial wherewithal to do so, were unable or unwilling to identify or discuss the source of the funds to be invested, and were unable or unwilling to satisfy us that potential investors received adequate disclosure regarding the impaired or uncertain nature of the LottoNet assets. Consequently, the Receiver has been unable to complete the sale of LottoNet and/or its intellectual property, and finds it unlikely that such a sale can be negotiated in the future.

### III.   STATUS OF FINAL FEE APPLICATION AND FINAL ACCOUNTING

#### A.   The Receiver requests an additional 90 days to provide a final accounting and fee application so that he can attempt to repatriate funds from Peru.

As stated in the Court's order requiring status report [ECF No. 88], the Court's order appointing me as Receiver contemplated interim requests for compensation and expenses by the Receiver as well as a final fee application "describing in detail the costs and benefits associated with all litigation and other actions pursued by the Receiver during the course of the receivership." [ECF No. 12 at 17]. Moreover, at the close of the Receivership, the Receiver "shall submit a Final Accounting, in a form to be provided by SEC staff, as well as the Receiver's final application for compensation and expense reimbursement." *Id.* at 18.

As explained above, I am in the process of investigating and assessing the appropriate course of action to successfully repatriate the LottoNet Peru Interbank account funds. If the funds can be repatriated, it would greatly benefit the Receivership. Consequently, I respectfully request

an additional ninety (90) days to provide a final accounting and fee application. The additional time will permit me to continue my efforts to repatriate the LottoNet Peru Interbank account funds.

Nonetheless, for informational purposes only, I have included below a summary of the fees and expenses incurred by myself, my staff, and my legal counsel subsequent to my prior fee application.[4] I note that both the fees and expenses previously authorized by the Court, totaling $53,930.74 (comprised of $67,413,43 in fees net a 20% holdback) and $5,512.54 in expenses, far exceeded the total funds in the Estate's bank accounts, which total approximately $49,168.51. Consequently, myself, my staff, and my legal counsel will likely not be compensated for the work done and costs incurred from May 1, 2017 to the present.

**Summary of Receiver's Time**
**from May 1, 2017 through May 16, 2018**

The following is the aggregate tabular summary for the Receiver:

| Name of Professional | Hourly Rate | Time | Fee calculation |
|---|---|---|---|
| Ryan K. Stumphauzer | $325 | 52.10 | $17,552.50 |
| Jeffrey Sloman | $325 | 24.68 | $8,019.83 |
| Christopher Gottfried | $250 | .80 | $200.00 |
| Jorge Pérez Santiago | $250 | 22.50 | $5,626.00 |
| Jennifer Dempsey | $75 | 1.00 | $75.00 |
| Janet Diaz | $75 | .40 | $30.00 |
| **Subtotal:** | | **101.48** | **$31,503.33** |
| **Total with 20% Holdback** | | | **$25,202.66** |

**Summary of Receiver's Counsel's Time**
**from May 1, 2017 through April 30, 2018**

The following is an aggregate tabular summary for the Receiver's counsel:

| Name of Professional | Hourly Rate | Time | Fee Calculation |
|---|---|---|---|
| Adam L. Schwartz | $320 | 68.20 | $21,824.00 |

---

[4] In the Final Fee Application, the Receiver will include reports and information in support of these summaries similar to the reports attached to the Interim Application.

| Cara Grand | $220 | 5.80 | $1,276.00 |
|---|---|---|---|
| Yaniv Adar | $250 | 3.80 | $932.00 |
| **Subtotal:** | | **77.80** | **$24,032.00** |
| **Total with 20% Holdback** | | | **$19,225.60** |

| **Total Hours by Receiver and Firm:** | 179. 28 |
|---|---|
| **Total Fees of Receiver and Firm (With 20% Holdback):** | $44,428.26 |

In sum, the Receiver and his associates have expended a total of 101.48 hours from May 1, 2017 to May 16, 2018, and the Receiver's counsel has expended a total of 77.8 hours from May 1, 2017 up through and including April 30, 2018, in rendering necessary and beneficial services to the Receivership estate for which the Receiver and his counsel may eventually seek authorization for compensation if additional funds are repatriated.

As of May 16, 2018, and other than the expenses referred to above and in prior reports from the Receiver, the Receiver and his counsel have not incurred significant actual and necessary expense items.

### IV. CONCLUSION

Based on the forgoing, I respectfully request an additional ninety (90) days to provide a final accounting and fee application for the Receivership.

Dated: May 18, 2018.

                Respectfully submitted,

                s/ Ryan K. Stumphauzer
                Ryan K. Stumphuazer, Esq.
                Not individually, but solely in my capacity
                as Receiver for LottoNet Operating Corp.,
                Oracle Marketing Corp., CRM Interactive
                LLC, and The Council Club LLC

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 18, 2018, I electronically filed the above document using CM/ECF. I also certify that the foregoing document is being served this day on all parties, witnesses, and counsel of records identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those who are not authorized to receive Notices of Electronic Filing.

                                                              s/ Adam L. Schwartz
                                                              Adam L. Schwartz, Esq.
                                                              Florida Bar No. 0103163
                                                              Email: aschwartz@homerbonner.com
                                                              Attorney for Receiver

**HOMER BONNER JACOBS**

                                                              1200 Four Seasons Tower
                                                              1441 Brickell Avenue
                                                              Miami, Florida 33131
                                                              Phone: (305) 350-5116
                                                              Fax: (305) 982-0079

## SERVICE LIST

| | |
|---|---|
| Amie Riggle Berlin<br>Senior Trial Counsel<br>U.S. Securities and Exchange Commission<br>801 Brickell Avenue, Suite 1800<br>Miami, Florida 33131<br>Telephone: (305) 982-6300<br>Facsimile: (305) 536-4154<br>Email: berlina@sec.gov<br>*Attorney for Plaintiff*<br>*Via CM/ECF* | Joseph Vitale a/k/a Donovan Kelly<br>Register Number 15859-104<br>FDC Miami<br>Federal Detention Center<br>PO Box 019120<br>Miami, FL 33101<br>*Via U.S. Mail* |
| Bijan Sebastian Parwaresch, Esq.<br>407 Lincoln Road, Suite 12-E<br>Miami Beach, Florida 33139<br>Telephone: 305-505-8858<br>Email: bijanlaw@aol.com<br>*Counsel for Defendant Gray*<br>*Via Email* | |